National NuGrape Company v. Commissioner.
National NuGrape Co. v. Commissioner
Docket No. 3910.
United States Tax Court
1947 Tax Ct. Memo LEXIS 62; 6 T.C.M. (CCH) 1149; T.C.M. (RIA) 47287; October 10, 1947
M. E. Kilpatrick, Esq., 1045 Hurt Bldg., Atlanta, Ga., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined deficiencies against the petition as follows: 1940
Income Tax
$ 3,774.79
Declared Value Excess Prof-
its Tax
1,140.93
Excess Profits Tax
0.00
Total for 1940
$ 4,915.72
1941
Income Tax
$ 8,701.25
Declared Value Excess Prof-
its Tax
2,561.93
Excess Profits Tax
3,112.66
Total for 1941
$14,375.84
1942
Income Tax
$11,090.22
Declared Value Excess Prof-
its Tax
0.00
Excess Profits Tax
16,789.21
Total for 1942
$27,879.43
Total for all years
$47,170.99
*63 The deficiencies for the fiscal year 1940 are due to several adjustments made by the Commissioner in the net income of $104,029.09 reported on petitioner's return. Only one of these adjustments is contested. That one is adjustment (e) whereby the Commissioner disallowed salary deduction of $3,000. The Commissioner in his deficiency notice explained this adjustment as follows: "(o) The amount of $3,000.00 paid to W. R. Sullivan as salary has been disallowed as a deduction for the reason that neither the extent nor the value of the services rendered has been established. Section 23 (a) of the Internal Revenue Code." The deficiencies for the fiscal year 1941 are due to several adjustments made by the Commissioner to the net income of $174,154.90 reported by petitioner in its income tax return. Only two of these adjustments are contested, namely, (b) salary disallowance of $32,500 and (c) disallowance of compensation to officer, $7,500. Adjustment (b) is explained in the deficiency notice as follows: "(b) The amount of $32,500.00 paid to W. R. Sullivan as salary has been disallowed as a deduction for the reason that neither the extent nor the value of the *64 services rendered has been established. Section 23 (a) of the Internal Revenue Code." Adjustment (c) is explained in the deficiency notice as follows: "(c) It is held that $25,000.00 represents reasonable compensation for services rendered by O. R. Randall, president. Accordingly, the amount of $7,500.00 has been disallowed as being excessive." The deficiencies for the fiscal years 1942 are due to several adjustments made by the Commissioner to the net income of $199,532.68 reported by petitioner in its income tax return. The only one of these adjustments which is contested is adjustment (c) wherein the Commissioner has disallowed deduction of $49,000 salaries. Adjustment (c) is explained in the deficiency notice as follows: "(c) On your return you claimed a deduction for salaries paid to O. R. Randall, president, and W. R. Sullivan, Chairman of the board of directors, in the amount of $40,000.00 to each. It is held that $25,000.00 and $6,000.00 respectively, represent reasonable allowances for personal services rendered. Accordingly, the amounts of $15,000.00 and $34,000.00 have been disallowed as being excessive." Petitioner by appropriate assignments *65 of error contests the foregoing adjustments. Some of the facts were stipulated and others were developed by oral testimony and exhibits introduced in evidence. Findings of Facts The stipulated facts are made a part of these findings by reference. The petitioner is a corporation with principal office in Atlanta, Georgia. The returns for the periods here involved were filed with the collector for the district of Georgia. In the year 1933, the NuGrape Company of America, a corporation engaged since 1924 in the manufacture and sale of NuGrape and other beverages, went into bankruptcy. The company had experienced considerable success until 1930, after which it encountered difficulties and deficits, which lead to its bankruptcy. On April 17, 1933, the assets of the bankrupt company were sold at bankruptcy sale to W. F. Robertson and in turn were sold by him to W. R. Sullivan for $45,000. The assets thus purchased, together with other assets owned by Sullivan, were immediately conveyed by him to a newly formed corporation, National NuGrape Company, the petitioner herein. Thereafter Sullivan was the controlling stockholder. With respect to the $400,000 capital stock of petitioner *66 the facts are as follows: (a) 319,529 shares issued to W. R. Sullivan as follows: 90,000 shares at $1.00 per share in exchange for assets of old NuGrape Company of America which had been bought from W. F. Robertson for $45,000 and for assets of the old Brandimist Company at $45,000; 229,529 shares issued for non negotiable, non interest bearing notes of W. R. Sullivan for $229,529. (b) 25,503 shares issued to O. R. Randall for non negotiable, non interest bearing notes of O. R. Randall for $25,503. (c) 54,968 shares of stock sold for cash to the stockholders of the old NuGrape Company of America at $1.00 per share, or $54,968. O. R. Randall, hereinafter referred to as "Randall", had caused W. R. Sullivan, hereinafter referred to as "Sullivan", to become interested in the assets of the old bankrupt company, NuGrape Company of America. Randall became president of the new corporation from the date of its organization in 1933 and continued as such until his death early in 1943. Sullivan did not hold any official title as one of the corporate officers of petitioner until 1940, when he was made advisor to the executive officers. On April 22, 1941, Sullivan was elected to the *67 board of directors of the company and on the same day he was elected chairman of the board of directors. The first fiscal year of the petitioner company ended March 31, 1934. The followng schedule shows for each fiscal year, March 31, 1934, through March 31, 1942, the following: During the fiscal years ended March 31, 1940, March 31, 1941 and March 31, 1942, the petitioner paid or credited to Randall and to Sullivan the following amounts as compensation: Fiscal year March 31, 1940
W. R. Sullivan
$ 3,000
O. R. Randall
15,100
Fiscal year March 31, 1941
W. R. Sullivan
32,500
O. R. Randall
32,500
Fiscal year March 31, 1942
W. R. Sullivan
40,000
O. R. Randall
40,000
The total compensation paid to officers of petitioner other than Sullivan and Randall during the years involved in this proceeding was as follows: March 1, 1940
$10,100
March 1, 1941
10,456
March 1, 1942
22,381
During the three fiscal years ended March 31, 1940, March 31, 1941 and March 31, 1942, the number of employees of the petitioner, other than Sullivan, Randall and the other officers, did not increase, there being during each of these three years a total of approximately *68 50 people employed, other than Sullivan, Randall and the other officers. Although the number of people employed during the three years did not increase, the total compensation paid to these approximately 50 employees during the fiscal year 1940 was $142,138, during the fiscal year 1941 the total paid them was $200,339, and the total compensation paid them during the fiscal year 1942 was $257,795, as follows: YEAR ENDED MARCH 31
1934
1935
1936
1937
1938
1939
Gross Sales Per Fed-
eral Income Tax
Returns
$135.855
$242,242
$253,709
$432,209
$597,676
$674,897
Net Income Per
Federal Income
Tax Return
(10,040)
(10,192)
(9,525)
31,088
31,538
71,037
Net Income After
Federal Income
Taxes
24,875
25,738
58,040
Dividends Paid
None
None
None
10,000
12,500
20,000
Percent of Divi-
dends Paid to
Total Outstanding
Stock
None
None
None
2.5%
3.125%
5%
Shares Owned by
Sullivan
319,529
319,529
319,529
319,529
319,529
322,789
Shares Owned by
Randall
25,503
25,503
25,503
25,503
25,503
25,513
YEAR ENDED MARCH 31
1940
1941
1942
Gross Sales Per Fed-
eral Income Tax
Returns
$1,074,132
$1,125,124
$1,484,093
Net Income Per
Federal Income
Tax Return
104,029
174,154
199,532
Net Income After
Federal Income Taxes
85,324
117,611
114,514
Dividends Paid
60,000
80,000
100,000
Percent of Divi-
dends Paid to
Total Outstanding
Stock
15%
20%
25%
Shares Owned by
Sullivan
323,892
318,485
290,788
Shares Owned by
Randall
25,513
25,513
22,563
*69 Salaries Y/E
3/31/40
3/31/41
3/31/42
#302
Laboratory
$ 12,500
$ 14,304
$ 22,317
#308
Plant
9,806
12,327
15,339
#303
Salesmen
(Salaries)
17,513
33,053
47,272
#504
Commissions
88,615
124,985
153,001
#603
Office
13,604
14,180
19,866
$142,038
$198,849
$257,795
Sullivan's Business Experience: Sullivan's business experience began immediately after he left high school when he was about 18 years of age, his first work being in a law office in Atlanta from the year 1895 to 1899, after which he went to New York and became a clerk in the Planned System of Railways, which position he held for about three months, when he became secretary to the president of the Planned System of Railways, which company is presently the Atlantic Coast Line Company. He remained as secretary to the president of that railroad from 1899 until December 1905. In December 1905, Sullivan was made assistant to the president of the Atlantic Coast Line Company and moved to Wilmington, North Carolina. He held this position until January 1, 1912, when he resigned to accept a position with the investment banking firm of Redman & Co., in New York City. He stayed with Redman *70 & Co. until 1925, and during this period with Redman & Co. he was an advisor as to railroad securities handled by that firm. During this period he gave study to operating statements, balance sheets and financial conditions of various companies. In addition, during the time that he was a specialist in railroad bonds with Redman & Co. he was appointed as one of two receivers of the Georgia & Florida Railroad in 1915, and as one of the two receivers he operated that railroad for five years. Likewise, during the same period, he was secretary and a member of the bondholders' committee of the Independent Chemical Company, which was in bankruptcy. In 1925, Sullivan left Redman & Co. and became interested in the gasoline and oil distribution business in Maine and New Hampshire. He became president and practically the sole owner of the Little & Coffin Oil Company and operated this business until August 1930, when he sold the business to the Tide Water Oil Company, having operated it about six years. He sold the business for $1,000,000, and at a profit of around $510,000. He next became interested in the Merchants Fertilizer Company in Charleston, South Carolina, in December 1931. This was *71 a fertilizer business and Sullivan acquired a one-half interest in the company which he held until April 1943, when he sold his interest at a profit of $200,000. He also acquired almost all of the capital stock of the Etiwan Fertilizer Company in 1936 or 1937, and he participated in a general way in the operation of that company. He also acquired an interest in the Shipyard River Terminal Company incident to the operation of the Etiwan Fertilizer Company. In addition to these activities, Sullivan during the years has traded in, bought and sold a great many bonds and securities of all kinds, and incident to these transactions he has studied over the years the operating statements and balance sheets, not only of the companies in which he invested, but of all allied corporations, including railroads. General Facts as to Services of Sullivan and Randall: The petitioner company was formed and made possible through money advanced by Sullivan. At the time of its formation it acquired the assets of the old NuGrape Company of America from Sullivan, as has already been stated. The petitioner company since its formation has sold NuGrape and other concentrates for a soft drink beverage. *72 When petitioner began business in 1933, it concentrated on NuGrape. There had been a number of NuGrape bottlers for the old bankrupt company but they were more or less dormant. Sullivan and Randall began to activate the new business by putting a force of men into the field; they devised advertising and formed service groups and did everything else that was possible to promote sales in the limited way which was necessary at first. Randall and Sullivan planned the operations of the company and determined its policies, after consultation with each other, Randall was the president of petitioner and its chief executive officer. He devoted all of his time to the business. They discussed frequently the sales policy of the company and determined upon the advertising with Sullivan particularly passing upon the financing and advertising, inasmuch as the company had no credit at the time and it was necessary for the company to borrow money, which Sullivan arranged, and Sullivan had to endorse the paper of the company at first. Sullivan, when he was in the city, was frequently at the office of the petitioner company and when there he spent his time in discussions and meetings with Randall and *73 other department heads, namely, Dr. Dimmock, the chief chemist, E. A. Randall, in charge of sales, the secretary and the auditor. When the company was formed the factory and office were located on Nelson Street on leased premises which Sullivan and Randall did not consider adequate for the project which they had in mind for petitioner. They arranged to purchase a lot for the company on Forest Road to hold in reserve pending the time when it would be necessary to move from the old location. Sullivan, during the early years, was not an officer of the company and consequently he and Randall considered that it was good policy that all the decisions which he and Randall had determined upon be transmitted to department heads or put into execution throughout the company by having Randall give the instructions to the various department heads and others. The principal raw materials that went into the products sold by the petitioner were wine, grape juice, sugar and orange juice, and Sullivan took an active part in the determination of the policy with respect to the purchase of these raw materials. At times the corporation experienced great difficulty in obtaining these raw materials, *74 especially as to wine and orange juice, particularly in 1941 and 1942. Sullivan through his wide business experience was able to render very valuable assistance to petitioner in securing these needed raw materials. The company has done a little foreign business since it was organized. Randall and others in the organization took part in the preliminary negotiations with the Winola Corporation of Canada, looking towards a contract for distribution of the company's products in Canada and the British West Indies, and when the negotiations had reached the contract stage, Sullivan was brought into the negotiations, was thoroughly familiar with the arrangement, approved it, and approved the contract, which has been a source of revenue averaging the company a net profit of around $30,000 a year since it was commenced. This arrangement was made prior to 1940 and the Winola Company distributed the company's products in Canada, Barbados, Jamaica, Curacao, Trinidad, Venezuela and Aruba. In 1937, the lot which had been bought on Forest Road in 1935 was utilized for the construction of a new building, a three-story structure of fire-proof construction, equipped with tanks, escalators and a three-car *75 railroad siding sufficient to handle the products of the company, and including sufficient space for the offices of the company which are located on the second floor. Sullivan was out of the country at the time that Randall suggested that the leased premises on Nelson Street be vacated, and Sullivan cabled Randall to canvass the field and see if another rental location could be obtained. When Randall replied that none was available, Sullivan, as advisor of the company and controlling stockholder, directed that the property on Forest Road be developed. Sullivan had no particular office at the general offices. An office was originally assigned to him but by virtue of its need for other purposes he relinquished it and had his principal office at his home in Atlanta. However, he utilized Randall's office at the plant when he was there, which was quite frequent. While Sullivan was not on the board of directors during the first years as controlling stockholder, he named the board of directors, and, with Randall, cooperated actively to the end of making and developing a good business and a successful one for the stockholders. Sullivan was first put on the payroll of the company during the *76 fiscal year ended March 31, 1940. It had been the subject of discussion between Randall and Sullivan with the understanding that Sullivan would remain off the payroll until the company was in a position and could afford to bear this expense. During the early years the company felt it could not afford to pay any salary to Sullivan. Randall had started out with a salary of $300 a month. which was a very modest sum for the work he did. This policy of low salaries to the management in the early years of the company was adopted in order that the company might get soundly on its feet financially before paying larger salaries to management. Sullivan was put on the payroll of the company as of January 1, 1940, as a result of the action taken by the board of directors and he received only $3,000 during that fiscal year, inasmuch as the compensation was fixed at $1,000 a month, effective January 1, 1940, and the fiscal year ended March 31, 1940. The gist of the action taken by the board of directors in fixing compensation for Sullivan and later increasing it, and also increasing the compensation for Randall, and general salary and bonus action taken, and the action taken in electing Sullivan *77 to the board and as chairman of the board, is contained in the minutes of meetings as follows: "In consideration of the time given by W. R. Sullivan in assisting in the promotion of the company's affairs in the past and the necessity of his cooperation in an advisory capacity in the future, be it resolved that W. R. Sullivan be placed on the payroll of this company, solely in an advisory capacity to the executive officers, and at a salary of $1,000.00 per month, retroactive as of January 1, 1940, and that a salary account be opened on our books to this effect." [Directors' meeting, March 16, 1940.] "Mr. Randall, President of the corporation, stated that the operations of the business of the company for the present fiscal year have been very gratifying and that all indications point to satisfactory business in the future. He stated that he was anxious, therefore, to place certain officers and employees of the Company on a salary basis commensurate with the services performed, and the results now being obtained. He stated that he, himself, along with other executive officers of the Company, had been paid compensation insufficient in amount since the organization of the Company, *78 and that this had been done solely out of consideration of the fact that the Company started out as a successor to the assets of a bankrupt corporation. He stated that the operations now warrant and indeed require compensation to officers and certain employees for their services up to date, and that, moreover, the future basis of compensation of certain executives and key employees should be increased to a point to assure the Company that these men will remain with the Company and not seek employment in the same field elsewhere at compensation commensurate with their services. Thereupon, on motion, the following resolution was unanimously adopted: "RESOLVED, that effective November 1, 1940, the salaries of O. R. Randall, President, and W. R. Sullivan, Advisor to the Executive Officers, be increased to $2,000 a month. "BE IT FURTHER RESOLVED, that the President and said advisor be and they are hereby authorized to increase the salaries of other officers and employees in the Company to such amounts as in their sole discretion is proper to adequately and fairly compensate such other officers and employees for their services in the future. "BE IT FURTHER RESOLVED, that said two executives *79 are likewise authorized to fix a bonus for the present fiscal year ending March 31, 1941, and to distribute said bonus to the executives and employees of the Company on such basis as in the judgment and discretion of the President and the Advisor is fair; said bonus, however, not to exceed a total of $35,000." * * *
[Directors' meeting, November 26, 1940.] "WHEREAS, at a meeting of the Board of Directors held Nov. 26y 1940, a resolution was passed, authorizing W. R. Sullivan and O. R. Randall to increase, at their sole discretion, salaries of officers and other employees of the company, in order to compensate adequately such officers and employees for their services; and WHEREAS, at this same meeting it was resolved that W. R. Sullivan and O. R. Randall fix a bonus for all employees for the present fiscal year ending March 31, 1941, and such bonuses were paid in the month of December to all, except in the higher brackets. BE IT NOW RESOLVED, upon recommendation of W. R. Sullivan and O. R. Randall, the attached list of names be paid a bonus on or before March 31st, the amounts shown opposite their names, LIST OF EMPLOYEES AND BONUSES TO BE PAID MARCH 31, 1941 W. R. Sullivan
$12,000.00
O. R. Randall
12,000.00
W. E. Dimmock
1,500.00
E. A. Randall
1,500.00
J. G. Sullivan
1,000.00
W. G. Grant
1,000.00
*80 [Directors' meeting, March 13, 1941]" At the stockholders' meeting April 22, 1941, Sullivan was added to the board of directors. "Upon motion, duly made, seconded and unanimously carried, the following officers were elected to serve for one year or until their successors are elected and qualified: W. R. Sullivan, Chairman of the Board, O. R. Randall, President, E. A. Randall, Vice-President, H. Harris, Vice-President and Secretary, J. G. Sullivan, Treasurer, W. E. Dimmock, Assistant Secretary. "Upon motion, duly made, seconded and unanimously carried, the salaries of the officers named above, were to be the same as resolution passed by Board of Directors March 13, 1941, effective as of April 1, 1941, and until further notice." [Directors' meeting, April 22, 1941.] "BE IT FURTHER RESOLVED, That the attached list of names be paid a bonus on or before March 31, 1942, the amounts shown opposite their names; all other employees having been paid a bonus in December of 1941. LIST OF BONUSES AUTHORIZED AT DIRECTORS' MEETING - March 12, 1942 Payable March 31, 1942 W. R. Sullivan
$16,000.00
O. R. Randall
16,000.00
W. E. Dimmock
2,000.00
H. Harris
1,000.00
E. A. Randall
1,000.00
J. G. Sullivan
1,000.00
W. G. Grant
1,000.00
*81 [Meeting of Directors, March 12, 1942]" Reasonable compensation for services rendered to petitioner by W. R. Sullivan and O. R. Randall was as follows: Fiscal year ended March 31, 1940
W. R. Sullivan
$ 3,000
O. R. Randall
15,100
Fiscal year ended March 31, 1941
W. R. Sullivan
24,000
O. R. Randall
32,500
Fiscal year ended March 31, 1942
W. R. Sullivan
24,000
O. R. Randall
40,000
Opinion BLACK, Judge: The Commissioner in his determination of the deficiencies made several adjustments to the net income of petitioner as reported on its return for each of the taxable years. None of these adjustments are in controversy except those involving the disallowance by the Commissioner of certain parts of the salary and bonus deductions claimed by petitioner representing salaries and bonuses paid or credited to its president, O. R. Randall and to W. R. Sullivan, who for part of the time was designated as financial advisor to the company and later was made chairman of its board of directors. The facts with reference to these salary and bonus payments have been stated in considerable detail in our findings of fact and we shall endeavor not to unnecessarily repeat *82 them here. There is considerable discussion in the briefs of both parties concerning the weight to be given to the presumptive correctness of the determination of the Commissioner in such cases as we have here. Cases are cited by both parties along these lines. However, we shall not devote any time to a discussion of these cases having to do with the presumptive correctness of the Commissioner's determintion. Here we have a great deal of evidence, both stipulated and oral, bearing upon the reasonableness of the salaries and bonuses involved in this proceeding and in view of this extensive evidence, we think this is a case to be decided upon its facts and not upon the presumptive correctness of the Commissioner's determination. We see no reason to discuss the presumptive correctness of the Commissioner's determination as to either of the taxable years. Mertens, in his Law of Federal Income Taxation, vol. 4, sec. 25.51 says: "* * * In determining whether the particular salary or compensation payment is reasonable, the situation must be considered as a whole. Ordinarily no single factor is decisive. There are various tests which have been commonly applied in determining the reasonableness *83 of the particular salary or compensation, such as the ratio of the particular salary and the aggregate salaries to gross income, the size of the particular business, the extent and scope of the employees' work, the employees' qualifications and contributions to the business venture, amount of salaries paid to the particular employee in prior years, general economic conditions, prevailing salaries paid to employees performing similar services in a comparable enterprise, the availability of others to fill the office held by the particular employee, and salary policy of the corporation as to all employees. * * *" We have considered the foregoing factors, in so far as covered by the evidence in the record, in arriving at our conclusions of reasonable salaries, which conclusion has been embodied in our findings of fact. Not all of the factors mentioned in the above quotation from Mertens are represented in the evidence which is before us. Indeed, it is rare where we have all of such factors represented by the evidence in any case. But in the instant case we do have a great deal of evidence, stipulated and oral, bearing upon the reasonableness of the salaries of these two individuals, *84 Sullivan and Randall, and it is upon a careful consideration of this evidence that we have made our findings of fact. Now in further explanation of our findings we will first take up the salaries and bonuses credited or paid to Randall. Randall was the president of the company, its chief executive officer and devoted all of his time to the business. He has, since the taxable years, died and we did not have the benefit of his testimony at the hearing. However, the testimony indicates that he was an executive of excellent ability and the company, under his direction, aided by the counsel and advice of Sullivan, made excellent progress. The following facts and figures will give some indication of this progress. Sales increased from $135,855.57 in the fiscal year ending March 31, 1934, the first year of the company's business to $1,484,093.74 in the fiscal year ending March 31, 1942, the last taxable year we have before us. The management, of which Randall was the directing head, put the company on a profitable operating basis after the first three years, with constantly increasing profits before income taxes, as follows: March 31, 1934
Loss
($10,040.56)
March 31, 1935
Loss
( 10,192.08)
March 31, 1936
Loss
( 9,525.55)
March 31, 1937
Profit
31,088.44 March 31, 1938
Profit
31,538.62 March 31, 1939
Profit
71,037.13 March 31, 1940
Profit
104,029.09 March 31, 1941
Profit
174,154.90 March 31, 1942
Profit
199,532.68 *85 The company paid dividends on the 400,000 shares of common stock representing $400,000 of capital stock in substantial and ever increasing amounts, beginning with the first year in which there was a profit, namely: Percent of
Percent of
dividends
dividends
paid to
paid to net
Dividends
outstanding
earnings
Year
paid
capital stock
after taxes
3/31/37
$10,000
2.5%
41%
3/31/38
12,500
3.125%
49%
3/31/39
20,000
5%
34.5%
3/31/40
60,000
15%
72.5%
3/31/41
80,000
20%
68.5%
3/31/42
100,000
25%
87.7% with total dividends paid from date of organization in 1933, through the fiscal years involved herein, of $282,500, out of net earnings of approximately $395,000 or 72 per cent of the net earnings. For the three fiscal years involved, 1940, 1941 and 1942, a total of $240,000 dividends paid out of net earnings of approximately $316,000 during these three years, or 76 per cent of the net earnings for the three years. These results, it seems to us, speak for themselves in so far as the success of the management is concerned. We have, therefore, found that the salaries and bonuses credited or paid to Randall in each of the taxable *86 years were reasonable considering the value and importance of his services to the corporation. There is not the slightest reason to believe from the evidence that the amounts paid to Randall were intended in any manner to be dividend distributions. They represented the judgment of the directors as to the amounts of compensation that he should receive as reasonable compensation for his services and we see no reason to disturb these amounts. In $ Templeton, Kenly & Co., Ltd., 6 B.T.A. 61, we approved as reasonable a salary of $30,000 paid by the taxpayer to its president for the years u918 and 1919. In doing so we said: "Measured by the results accomplished, both from the standpoint of volume of business transacted and profits arising to the corporation therefrom, and the nature of the services rendered by the President, the Board is of the opinion that the amounts paid to Templeton as compensation were not unreasonable or excessive and should be allowed as a deduction." We think a similar statement as the above is applicable to the compensation paid to Randall as president of petitioner. We overrule the Commissioner's disallowances as to him. Now as to the amounts *87 credited or paid to Sullivan, we think the situation is somewhat different. He was not the chief executive officer of the company and he did not devote anything like full time to the business. The evidence shows that he had numerous other business interests which undoubtedly took considerable part of his time. However, he did render to petitioner valuable and important services both in the taxable years and in years prior thereto. The nature of the services which Sullivan rendered to petitioner have been fully stated in our findings of fact and need not be repeated here. Suffice it to say that upon a consideration of these facts, we have found that reasonable compensation for services rendered by Sullivan to petitioner is $3,000 for the fiscal year ending March 31, 1940 (this is the amount claimed by petitioner and disallowed by the Commissioner - it represents $1,000 per month from January 1, 1940 to March 31, 1940); $24,000 for the fiscal year ending March 31, 1941 (as against the $32,500 claimed by petitioner, all of which was disallowed by the Commissioner); and $24,000 for the fiscal year ending March 31, 1942 (as against the $40,000 claimed by petitioner and the $6,000 allowed *88 by the Commissioner). The amounts which we have determined in our findings of fact to be reasonable compensation for Randall's and Sullivan's services to petitioner should be used in a recomputation under Rule 50. Decision will be entered under Rule 50.